*Attorney Grievance Commission of Maryland v. Celestine Tatung*, Miscellaneous Docket AG No. 14, September Term, 2020, Opinion by Booth, J.


**ATTORNEY DISCIPLINE – SANCTIONS – CHOICE OF LAW - DISMISSAL**

This attorney grievance matter involves an attorney who made a handful of careless mistakes in connection with his representation of two clients seeking asylum in a federal immigration proceeding in Texas. The attorney objected to the charges on the ground that, under the choice of law provisions set forth in the Maryland Attorneys Rules of Professional Conduct ("MARPC") 19-308.5(b), the Attorney Grievance Commission ("Commission") was required to apply the federal regulations that address professional conduct in immigration proceedings and not the MARPC. The Court agreed that, under the plain language of MARPC 19.805(b), the federal immigration professional rules applied. Under the facts presented in this case, dismissal of those charges was warranted. Applying the MARPC to the charges of misconduct in the underlying disciplinary proceeding, the Court determined that Bar Counsel had failed to prove a violation of the MARPC by clear and convincing evidence. Accordingly, the Court dismissed those charges.

Circuit Court for Prince George's County
Case No.: CAE20-12282
Argued: June 4, 2021

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 14

September Term, 2020

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

CELESTINE TATUNG

Barbera, C.J.
McDonald
Getty
Booth
Biran
Wilner, Alan M.
   (Senior Judge, Specially Assigned)
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.
Harrell, J., Dissents.

Filed: August 26, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The practice of law, like many other professions, has become more mobile. Our profession is no longer confined to the traditional law office setting. Indeed, attorneys can practice law from their home—or virtually anywhere—with the modern conveniences of a high-speed internet connection, a cellphone and a laptop. With this portability, it is increasingly possible for an attorney to practice law from a location other than the jurisdiction in which he or she is licensed. Some attorneys exclusively practice in a particular area of the law—such as federal bankruptcy or immigration—where they are not required to be barred in the state where they maintain a principal office, so long as their practice is limited to those predominantly federal areas of law. As more states adopt the Uniform Bar Examination, it's also easier (and more common) for attorneys to become licensed in more than one state. Our Maryland Attorneys' Rules of Professional Conduct ("MARPC") are clear that, if an attorney practices law in this State—regardless of whether he or she is licensed in Maryland—the attorney is subject to the disciplinary authority of this State.

In this attorney grievance proceeding, the Respondent, Celestine Tatung has raised a choice of law question involving the rules of professional conduct that apply in a Maryland attorney disciplinary proceeding where the particular misconduct alleged by the Attorney Grievance Commission (the "Commission") occurred in connection with his representation of two clients in federal immigration proceedings in Texas. As we will discuss more fully herein, Mr. Tatung made a handful of careless mistakes in connection with his clients' representation—he did not check to see if the immigration judge had any standing orders in place concerning telephonic appearances at master calendar hearings

(which caused him to miss his clients' hearings); he filed an affidavit purporting to authenticate his clients' foreign witness affidavits in both of his clients' cases when it only pertained to one client's case; and he negotiated a fixed fee agreement for the representation (which included his travel expenses), anticipating that he would need to make only two trips to Texas, instead of the four trips that he ultimately made.

Mr. Tatung argues that, under the choice of law provisions set forth in MARPC 19-308.5(b), the Commission was required to charge him under the rules of professional conduct that apply to federal immigration proceedings, and not the Maryland professional conduct rules. For the reasons stated in this opinion, we agree with Mr. Tatung. Accordingly, we shall dismiss the charges filed under the MARPC that pertain to the alleged wrongful conduct that arose in connection with the federal immigration proceeding.

The Commission also charged Mr. Tatung for violating the MARPC in connection with its investigation. Although the MARPC applies to allegations of misconduct arising in connection with the disciplinary investigation, based upon our independent review of the record, we conclude that Bar Counsel failed to prove by clear and convincing evidence that Mr. Tatung violated the MARPC in connection with the investigation. Accordingly, we shall also dismiss those charges. We explain below our analysis and conclusions that support the dismissal of all charges brought against Mr. Tatung.

# I

## Background

On May 20, 2020, the Commission, through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Mr. Tatung, alleging that he had violated

2

numerous provisions of the rules of professional conduct. These included Maryland Attorneys' Rules of Professional Conduct ("MARPC")[1] 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 1.15 (Safekeeping Property), 3.3 (Candor Toward the Tribunal), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct). Bar Counsel also charged Mr. Tatung under Maryland Code, Business Occupations and Professions Article ("BOP") § 10-304.

Pursuant to Rule 19-722(a), we designated Judge Bryon S. Bereano of the Circuit Court for Prince George's County ("the hearing judge") to conduct a hearing concerning the alleged violations and to provide findings of fact and conclusions of law. Following a hearing in November 2020, the hearing judge concluded that Mr. Tatung violated Rule 1.1, Rule 1.3, Rule 1.5, Rule 8.1(a), and Rule 8.4 (a), (c) and (d). The hearing judge concluded that there was insufficient evidence to establish violations of Rule 1.4, Rule 1.15, Rule 3.3, and BOP § 10-304.

## II

### Standard of Review

In discussing the underlying facts and the legal issues presented in this case, we note that this Court has original and complete jurisdiction in attorney disciplinary proceedings and conducts an independent review of the record. *Attorney Grievance Comm'n v. Ambe*,

---

[1] The MARPC are codified as Maryland Rule 19-300.1 *et seq.* For readability, we use shortened references—*i.e.*, Maryland Rule 19-301.1 will be referred to as Rule 1.1—that will allow easier cross-references to prior codifications of these rules, as well as to similar rules in other jurisdictions and the ABA model rules on which they are based. *See* American Bar Association, *ABA Compendium of Professional Responsibility Rules and Standards* (2017).

466 Md. 270, 286 (2019) (citations omitted). As part of that original jurisdiction, Rule 19-741(c)(1) states that "[t]he Court of Appeals may order (A) disbarment, (B) suspension, (C) a reprimand, (D) placement on inactive status, (E) dismissal of the disciplinary or remedial action, or (F) a remand for further proceedings" in grievance cases when deemed appropriate.

In an attorney grievance matter, this Court reviews the lower court's recommended conclusions of law *de novo*. Md. Rule 19-741(b)(1); *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 545 (2014). When assessing the hearing judge's findings of fact, we review for clear error. *Attorney Grievance Comm'n v. Maldonado*, 463 Md. 11, 33 (2019). If exceptions to the findings of facts are filed, the Court "shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 19-727(c)." Md. Rule 19-741(b)(2)(B); *Maldonado*, 463 Md. at 33. "Bar Counsel has the burden of proving the averments of the petition by clear and convincing evidence." Md. Rule 19-727(c). "If the attorney asserts an affirmative defense or a matter of mitigation or extenuation, the attorney has the burden of proving the defense or matter by a preponderance of the evidence." *Id.*

Prior to the evidentiary hearing, Mr. Tatung filed a motion *in limine*, arguing that, under the choice of law provisions set forth in Rule 8.5(b), he was required to be charged under the federal rules promulgated by the Executive Office of Immigration Review ("EOIR") of the United States Justice Department, namely 8 C.F.R. § 1003.102 (2012). Mr. Tatung asserted that, under the plain language of Rule 8.5(b), the MARPC did not apply to the alleged misconduct that arose in the context of the Texas federal immigration proceeding.

The hearing judge denied Mr. Tatung's motion and proceeded with the evidentiary hearing. We address the choice of law issue more fully herein. But to provide some context for our conclusion concerning the choice of law provisions, and the reasons for our dismissal, we provide the factual background and procedure that informs our decision. Bar Counsel and Mr. Tatung each filed several exceptions to the hearing judge's findings of fact and conclusions of law.[2]

---

[2] Although we are dismissing the charges filed against Mr. Tatung related to the immigration proceeding based upon the choice of law issue that he has raised, we nonetheless explain how we would have ruled upon Mr. Tatung's and Bar Counsel's exceptions to the various findings of fact and legal conclusions made by the hearing judge.

At the evidentiary hearing, Mr. Tatung and his legal assistant, Karina Chacon, were the only individuals who testified concerning the matters arising in the federal immigration proceeding. Bar Counsel also admitted into evidence significant portions of the record in the Texas immigration proceeding, including the applications for asylum and amendments thereto, witness statements and the transcripts of the proceedings before Judge Abbott. Mr. Tatung's clients' relatives testified only to those matters pertaining to the fees that they negotiated and paid to Mr. Tatung for his representation and their efforts to obtain the foreign witness affidavit, which we describe herein.

In his findings of fact and conclusions of law, the hearing judge did not provide any record references that would allow us to ascertain what evidence he relied upon in making his factual determinations. In several instances, the findings of fact and conclusions of law are internally inconsistent. We are mindful that, a hearing judge, in assessing the credibility of witnesses and making findings of fact, is free to "pick and choose from which evidence to rely upon." *Attorney Grievance Comm'n v. Lang*, 461 Md. 1, 27 (2018) (internal quotations omitted). "In the same vein, a hearing judge need not mention every evidentiary matter in its findings of fact." *Id.* (internal quotations omitted). That being said, we do not simply rubber stamp the factual findings, including credibility determinations. We conduct our own independent review of the record and will overturn them if they are clearly erroneous.

### III

### Factual and Procedural Background

#### A. *Mr. Tatung's Law Practice*

Mr. Tatung was admitted to the District of Columbia bar on October 12, 2007. Mr. Tatung is not a member of the Maryland bar. In 2009, Mr. Tatung opened a law office in Prince George's County. He practices exclusively in immigration matters, representing approximately 300 clients per year and regularly appears in several United States immigration courts across the country every year.

#### B. *Mr. Tatung's Representation of Cameroon Citizens in a Federal Immigration Proceeding in Texas*

This disciplinary proceeding arises from Mr. Tatung's representation of two clients in immigration proceedings that occurred in the federal immigration court in Texas. Anim Khan and Rachel Amasioni ("the clients") are citizens of Cameroon. In January 2017, the clients presented themselves at the El Paso, Texas Port of Entry seeking asylum. They were detained at the El Paso processing center and placed in removal proceedings in the United States Immigration Court in El Paso, Texas with the Honorable William L. Abbott to preside over both of their cases. Both clients had relatives living in Ohio, and the relatives knew one another from the local Cameroonian community.[3]

Prior to Mr. Tatung's representation, the clients were represented by another attorney. After the first attorney withdrew from the cases, in July 2017, the clients'

---

[3] The Ohio relatives were Ms. Amasioni's sister, Miriam Feagwi Amasioni and Ms. Khan's cousin, Henrietta Bettah. For simplicity's sake, we sometimes collectively refer to these individuals as the "clients' relatives."

relatives contacted Mr. Tatung by telephone and retained him to represent the clients. The understanding was that Mr. Tatung would represent both individuals in their removal proceedings and attempt to obtain asylum for them in the United States. Mr. Tatung signed retainer agreements with the clients' relatives, as contacts. Neither the clients nor their family members received copies of any signed, executed retainer agreements. Under the terms of the representation, Mr. Tatung agreed to charge each client a flat fee of $5,000 for the duration of the representation, which included Mr. Tatung's travel expenses from Maryland to El Paso, Texas. Based upon his prior experience, Mr. Tatung expected that he would need to make two appearances in each case. The cases were originally set for the same day, which would enable Mr. Tatung to travel to Texas for both cases at the same time. Mr. Tatung received payments from the clients' relatives totaling $10,000.[4]

Mr. Tatung entered his appearance on behalf of both clients on July 26, 2017 in the federal immigration court sitting in El Paso, Texas. On August 2, 2017, Mr. Tatung filed an I-589 Application for Asylum and for Withholding of Removal on behalf of his clients. The application was intentionally incomplete. Mr. Tatung testified that the application is typically submitted without all the required information, such as a list of proposed

---

[4] The hearing judge found that the funds were not deposited into a trust account. However, given that Mr. Tatung is not a licensed Maryland attorney, the hearing judge correctly determined that the failure to maintain a client trust account was not a violation of Maryland Rule 1.15(a) or Maryland Code, Business Occupations and Professions Article § 10-304. *See Attorney Grievance Comm'n v. Lang*, 461 Md. 1, 53 (2018) (concluding that an attorney who maintains an office in Maryland but is not licensed to practice in Maryland cannot violate Rule 1.15(a) because the plain language of Maryland Rule 19-402 "explicitly defines 'attorney' in such a way as to exclude [the non-Maryland barred attorney] from any obligation to comply with the Maryland attorney trust requirements[]").

witnesses and required witness statements, with the understanding that the application is supplemented prior to the merits hearing.[5]

A master calendar hearing[6] was scheduled for both of Mr. Tatung's clients for August 23, 2017. Judge Abbott had adopted a standing order, which required counsel's in-person attendance at master calendar hearings.[7] Mr. Tatung did not check to see if Judge

---

[5] As the hearing judge noted in his findings of fact, Mr. Tatung took over the representation of Ms. Khan and Ms. Amasioni from another attorney. Mr. Tatung testified, and the immigration court's record confirms, that the prior counsel withdrew from the cases, which resulted in significant delays. The clients had been in custody since January 2017. Mr. Tatung testified that there was insufficient time to gather all of the required documents (such as the affidavits from Cameroon citizens to corroborate his clients' application) between the commencement of his engagement in mid-July and the August 23 master calendar hearing. The federal immigration court record confirms Mr. Tatung's explanation. The notarial seals on the foreign witness affidavits reflect that they were signed in Cameroon in mid-August.

[6] A master calendar hearing is an initial hearing in a federal immigration proceeding. As a general matter, the purpose of the master calendar hearing is to conduct preliminary matters, including: advising the respondent of the right to counsel; advising the respondent of the right to object to evidence and to cross-examine any witnesses presented by the Department of Homeland Security ("DHS"); explaining the charges and factual allegations contained in the Notice to Appeal to the respondent; taking pleadings; identifying and narrowing the factual and legal issues; setting deadlines for filing applications for relief, briefs, motions, pre-hearing statements, exhibits, witness lists and other documents; and setting the schedule for a merits hearing to adjudicate contested matters and applications for relief. *See* 8 C.F.R. §§ 1240.20, 1240.15.

[7] Based on our independent review of the record, Judge Abbott's standing order regarding telephonic appearances at master calendar hearings appears to be specific to him. The title of his standing order is "Standing Order of the Immigration Judge Regarding Telephonic Appearances (*IJ Abbott Only*)." (Capitalization omitted) (emphasis added). Under Judge Abbott's standing order, he does not permit attorneys to appear telephonically for master calendar hearings "absent exceptional circumstances[.]" Moreover, his standing order states that "distance from El Paso is not an exceptional circumstance[.]" However, his standing order further states that "[i]n lieu of personal appearance [at a master calendar hearing], counsel may submit pleadings in writing. If the charges are not conceded, a merits hearing will be scheduled." In other words, under Judge Abbott's standing order,

Abbott had a standing order in place and was under the misimpression that he could attend the master calendar hearing by telephone. Mr. Tatung requested to appear telephonically, and Judge Abbott denied this request by an order dated August 14, 2017.[8]

During the disciplinary proceeding, Mr. Tatung testified that he was unaware of Judge Abbott's standing order that required in-person attendance and the denial of his request to appear telephonically, until he called the immigration court on August 23 to participate in the master calendar hearing.[9] When the clients' cases were called, the clients were present, but Mr. Tatung was not. Judge Abbott rescheduled the master calendar hearing for September,[10] and subsequently scheduled a merits hearing for December 18 and 19, 2017.

---

counsel's personal appearance at a master calendar hearing is not required if a completed application is filed and accepted by the court. In such an instance, Judge Abbott will schedule a merits hearing.

[8] In Judge Abbott's order denying Mr. Tatung's motion to appear by telephone for the master calendar hearing, he explained that "[t]his court does not routinely allow attorneys to appear by telephone at master calendar[] hearings unless special circumstances exist." Although the order denied Mr. Tatung's motion to appear telephonically, the order also advised that "counsel need not be physically present at the master calendar . . . hearing provided that counsel follows the general directions articulated in more detail" in the standing order. A copy of the standing order was enclosed with the order denying Mr. Tatung's telephonic appearance. Read together, these orders reflect that, if and when the completed application for asylum is submitted and determined to be complete by the immigration court, Judge Abbott's practice is to schedule a merits hearing without further master calendar hearings. As discussed in note 10 *infra*, that is what occurred here.

[9] Mr. Tatung also testified that he had another immigration matter scheduled in Baltimore, Maryland on the day of the master calendar hearing. In his motion requesting permission to appear telephonically in the Texas immigration proceeding, Mr. Tatung apprised the Texas immigration court of this conflict.

[10] The hearing judge's findings of fact suggest that Judge Abbott scheduled a *merits* hearing for September, which had to be continued until December because Mr. Tatung failed to submit complete asylum applications. The hearing judge characterized Judge

9

On December 4, 2017, in advance of the scheduled merits hearings, Mr. Tatung filed the amended applications for asylum on behalf of the clients.[11]  Although the amended applications contained witness affidavits from Cameroon citizens that supported each clients' asylum application, Mr. Tatung had not obtained or filed an affidavit of attestation of foreign documents ("attestation affidavit") that was required by Judge Abbott to

Abbott's scheduling of the December merits hearing as "a second continuance" for the purpose of "allow[ing] Mr. Tatung to submit a completed application for asylum."  Mr. Tatung filed exceptions to the hearing judge's less-than-clear characterization of the immigration proceedings.  Had we not dismissed the charges pertaining to these facts, we would have sustained Mr. Tatung's exception.  Based upon our independent review of the record, including the transcripts of Judge Abbott's proceedings and the hearing notices that were entered by him, the record clearly shows the following sequence of events.

Mr. Tatung filed the applications for asylum, which the immigration court accepted for filing on August 2, 2017, as evidenced on the date stamp notation reflecting receipt and filing by the "U.S. DEPARTMENT OF JUSTICE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW IMMIGRATION COURT EL PASO, TX."  At the August 23 master calendar hearing (where Mr. Tatung was not present), Judge Abbott asked the clients about their application.  Judge Abbott's questions reflect that, although he had received Mr. Tatung's entry of appearance and request to appear telephonically, Judge Abbott was unaware that the applications for asylum had been filed.  Under the belief that the applications had not been filed, he advised both Ms. Khan and Ms. Amasioni that he was going to continue the master calendar hearing for two weeks until September 6 to enable Mr. Tatung to "prepare and submit" the applications.  On August 24—the day after the master calendar hearing—Judge Abbott issued a hearing notice scheduling the merits hearings for Mr. Tatung's clients for December.  It is clear from the record that the September master calendar hearing was simply canceled when Judge Abbott discovered that the application, had in fact, been filed by Mr. Tatung on August 2.

[11] The amended applications, titled "Respondent's Amended I-589 Supporting Evidence and Witness List" were filed in both Ms. Khan's and Ms. Amasioni's cases. Each application contains a declaration of the client, which describes in detail the circumstances of the clients' forced marriages, as well as affidavits of witnesses confirming the clients' forced marriage circumstances.  The amended applications also included publications confirming the widespread domestic violence that has been documented in Cameroon associated with the practice of forced marriages.  The affidavits in support of the applications were from witnesses living in Cameroon.

authenticate the clients' foreign witness affidavits.[12]  Judge Abbott brought this to Mr. Tatung's attention during the clients' merits hearings in December.  Judge Abbott continued the merits hearings to allow Mr. Tatung to submit the attestation affidavits.[13] Mr. Tatung then contacted Ms. Amasioni's sister to obtain an attestation affidavit for the witness statements.[14]  Ms. Amasioni's sister obtained the attestation affidavit for Ms. Amasioni's case and mailed it to Mr. Tatung on January 4, 2018.  On January 17, 2018,

---

[12] Judge Abbott explained his requirement for an attestation affidavit at the December 18, 2017 merits hearing.  During that hearing, Judge Abbott reviewed Ms. Khan's application and questioned her under oath.  After hearing Ms. Khan's initial testimony, Judge Abbott stated that the immigration laws require that Ms. Khan's membership in a particular social group be corroborated by witnesses.  He commented that Ms. Khan's application included corroborative affidavits from the principal wife of a king in Cameroon (to whom she was to be married), as well as an affidavit from Ms. Khan's mother and one other witness.  Judge Abbott explained that he required an attestation affidavit to authenticate the foreign witness affidavits, which he described as a "chain of custody" issue.  He stated that "[w]e need to know who obtained the affidavits, how they were obtained, and who touched them in their transit from Cameroon to my record."

[13] Mr. Tatung excepted to the hearing judge's finding of fact that, at Ms. Khan's merit's hearing on December 18, 2017, "Judge Abbott told Mr. Tatung that the December 4 application did not conform to his standing orders."  If we were not dismissing the charges pertaining to these facts, we would sustain Mr. Tatung's exception.  Based upon our independent review of the record, Judge Abbott did not tell Mr. Tatung that this was a requirement of his standing orders, nor does the record contain any standing order reflecting that Judge Abbott required an attestation affidavit.

[14] Mr. Tatung testified that he was not able to call his clients, who were residing in the immigration detention facility.  The only way that Mr. Tatung could communicate with his clients was for them to call him.  Upon learning of Judge Abbott's requirement of an attestation affidavit to authenticate the clients' foreign witness affidavits, Mr. Tatung communicated that information to Ms. Amasioni's sister.  Ms. Amasioni's sister obtained the attestation affidavit from Ngale Kinge Ewanda Roy-C ("Mr. Roy-C"), consisting of a single paragraph confirming that Mr. Roy-C had transmitted the foreign witness affidavits from Cameroon to Ms. Amasioni via mail through the DHL mailing service. Mr. Tatung testified that he believed that Ms. Amasioni's sister was obtaining the attestation affidavit for both clients.

11

Mr. Tatung filed the attestation affidavit in both of his clients' cases; however, the affidavit was applicable only to Ms. Amasioni's case and was filed in Ms. Khan's case in error.[15] Upon receipt of the attestation affidavit, the immigration court scheduled the continuation of the merits hearing for Ms. Khan on May 7, 2018 and for Ms. Amasioni on May 15, 2018.

On March 20, 2018, Mr. Tatung requested an additional $2,500 from the clients' relatives for his continued representation of the clients. On March 21, 2018, the relatives signed and returned the new retainer agreements, the terms of which were identical to the initial retainer agreement. The relatives testified that they were surprised to have to pay more for Mr. Tatung's representation because their understanding was that their initial payments would cover the entire case. Nonetheless, they paid the additional amount to Mr. Tatung in May 2018.

Ms. Khan's merits hearing occurred on May 7, 2018, and Ms. Amasioni's merits hearing occurred on May 15, 2018.[16] During Ms. Khan's merits hearing, the erroneously

---

[15] Both Mr. Tatung and his assistant, Karina Chacon, testified concerning the filing of Mr. Roy-C's attestation affidavit. Prior to leaving on a trip to Cameroon, Mr. Tatung had received an emailed copy of Mr. Roy-C's affidavit from Ms. Amasioni's sister. He told Ms. Chacon that the original attestation affidavit would be arriving by mail and instructed her to file it when it arrived. Mr. Tatung and Ms. Chacon both testified that the attestation affidavit from Mr. Roy-C did, in fact, arrive while Mr. Tatung was in Cameroon, and that Ms. Chacon promptly filed it with the immigration court as Mr. Tatung had instructed. Ms. Chacon then filed the copy in the file. Neither Ms. Chacon nor Mr. Tatung noticed that the attestation affidavit only pertained to Ms. Amasioni's foreign witness affidavits and not to Ms. Khan's affidavits. Mr. Tatung testified that he was not aware that the document had been filed in Ms. Khan's case in error. Neither Mr. Tatung, the DHS prosecutor, nor Judge Abbott pointed out the erroneously filed authentication affidavit during Ms. Khan's merits hearing. The erroneous filing appears to have gone unnoticed by everyone during the merits hearing.

[16] The record reflects that Mr. Tatung filed a motion to advance the merits hearing in both clients' cases, attempting to obtain an earlier hearing date on their behalf. The court

filed affidavit was not pointed out by Mr. Tatung, the Court, or the prosecutor for the Department of Homeland Security ("DHS"). At the end of the May 15 hearing, Judge Abbott invited Mr. Tatung to submit closing arguments in writing to the court by June 8.[17]

---

denied the motion on the basis that the May hearing dates were the first available dates on which the court could schedule the hearing.

[17] The transcripts of the immigration merits hearings reflect that the legal issue presented by the clients' cases—whether people forced into marriages constitute an identifiable social group that would entitle the clients to asylum—is novel and unsettled. At Ms. Khan's first merits hearing on December 18, 2017, Judge Abbott stated to Mr. Tatung and the DHS prosecutor: "I want to point out that this is an unusual case. I haven't seen [a forced marriage situation] in my court. I've heard of them before. So, this is – this is kind of new to me, [sic] are the force marriage situation." Judge Abbott invited both Mr. Tatung and the DHS prosecutor to address the novel legal issue "in a closing statement if necessary."

At the conclusion of Ms. Khan's merits hearing in May, Judge Abbott asked Mr. Tatung "[s]o – do we have any cases at all that you know of that are unpublished or published that talk about this being a social group . . .[?]". Mr. Tatung responded that "there's actually [a] 2nd Circuit Case. I know this is the 5th Circuit, but it's a sister circuit." The transcript of the merits hearing reflects a lengthy dialogue between Judge Abbott, Mr. Tatung and the DHS prosecutor, where they were all clearly grappling with the complex issue. Indeed, the DHS prosecutor even introduced exhibits describing the forced marriage conditions in Cameroon to illustrate how the potential condition might be considered a qualifying social group. After a lengthy discussion between the court and counsel concerning whether federal law recognizes forced marriage conditions as a social group, Judge Abbott specifically requested that both Mr. Tatung and the DHS prosecutor submit legal briefs on this point of law. Judge Abbott stated that "[i]t's really coming down to the legal application of the law to the facts of this case. And I am not comfortable making a decision on the facts right now." Judge Abbott specifically requested that Mr. Tatung attach to his brief any documents from the State Department "or even scholarly articles that address this issue[.]" Judge Abbott stated to both counsel "So I'm going to ask you all to brief that issue. Because whatever I decide is likely to be appealed, and I want to make sure we have our ducks lined up before that goes up. Make sense?" Given the novel issue, Judge Abbott suggested to *both* counsel that they may wish to enlist additional support— from the law school clinic (in Mr. Tatung's case), and from DHS's chief or senior counsel (in the prosecutor's case). In response to the court's request, counsel agreed to submit legal arguments on the social group issue.

13

Mr. Tatung submitted his closing argument by June 4. As part of his written closing arguments in support of his clients' asylum applications, Mr. Tatung presented his legal argument explaining why his clients were entitled to asylum by pointing out the social groups to which they belong that would entitle them to asylum under the federal immigration laws.[18] On July 31, 2018, Judge Abbott issued an order denying Ms. Khan's asylum application, application for withholding of removal and application under the Convention Against Torture. On August 10, 2018, Judge Abbott issued an order denying the same applications for Ms. Amasioni. Both clients were removed from the United States after the court's rulings.[19]

After the entry of the immigration court's removal orders, the clients retained new counsel to file an appeal on their behalf. In connection with the appeal, the clients argued they had received ineffective assistance of counsel from Mr. Tatung. The Board of

---

[18] Mr. Tatung excepts to the inference in the hearing judge's findings that, by including in his written closing statement the required identification of legal analysis and of social groups to which his clients belong, and which would entitle them to asylum relief, his actions reflected a lack of competence or diligence on his part. Had we not dismissed the charges to which these factual findings relate, we would sustain Mr. Tatung's exceptions. The transcript of the May 15, 2018 merits hearing is clear. As we observed note 17, *supra*, Judge Abbott *specifically requested* that Mr. Tatung and the DHS prosecutor submit legal briefing on the issue of social groups into which Ms. Khan and Ms. Amasioni might fall.

[19] Mr. Tatung excepts to the hearing judge's findings to the extent that the hearing judge did not make a specific factual finding that Judge Abbott decided Ms. Khan's and Ms. Amasioni's cases on their merits. Although we would have overruled Mr. Tatung's exception to the hearing judge's failure to make this factual finding (inasmuch as the hearing judge is not required to make findings on each piece of evidence), we nonetheless observe, based upon our review of the record, that Judge Abbott decided this case on the merits—and concluded that the clients' forced marriage circumstances did not fit within the legal criteria that would entitle them to asylum.

Immigration Appeals ("BIA"), the highest administrative body for interpreting and applying immigration laws, denied the appeals. As part of the denial of the appeal, the BIA determined that the clients had not received ineffective assistance from Mr. Tatung.

### C. Maryland Disciplinary Proceeding Against Mr. Tatung

On November 22, 2018, the clients each filed a complaint with Bar Counsel complaining of Mr. Tatung's representation in connection with their immigration proceeding. Bar Counsel wrote two letters to Mr. Tatung, dated December 6, 2018—one for each client—enclosing the complaints and requesting a written response. On December 15, Mr. Tatung provided a separate written response for each client. Bar Counsel sent follow-up letters on February 5, 2019, requesting information about certain details of the cases. On February 8 and 12, Mr. Tatung submitted written responses to Bar Counsel.[20] On February 26 and February 27, Bar Counsel sent Mr. Tantung follow-up letters requesting additional information in each case. Mr. Tatung responded to the letters on March 9 and 10. Bar Counsel sent additional letters to Mr. Tatung, which we discuss in more detail in Part IV.F, *infra*. In each instance, Mr. Tatung provided a timely response.

### D. Evidentiary Hearing Before the Hearing Judge

As previously noted, Mr. Tatung filed a motion *in limine*, arguing that under Maryland's choice of law rules for attorney discipline—specifically Rule 8.5(b)—the

---

[20] In his findings of fact, the hearing judge stated that, in Mr. Tatung's responses to Bar Counsel's letters, Mr. Tatung simply "reiterate[ed] his prior answers and defenses to the questions Bar Counsel re-raised." Mr. Tatung excepted to the hearing judge's characterization of his written responses. We sustain this exception. Mr. Tatung's responses reflect that he provided tailored written responses to each letter from Bar Counsel requesting documents and explanations from him.

Commission had incorrectly charged him for violating the MARPC instead of applying the federal immigration courts' rules promulgated by the Executive Office of Immigration Review of the U.S. Department of Justice. *See* 8 C.F.R. § 1003.102 (2012). Mr. Tatung asserted that, because the Commission had not applied or charged him under the federal immigration professional rules, the matter should not be permitted to proceed. Bar Counsel responded by asserting that an interpretation of the applicable choice of law rules could "only be made by the Court of Appeals" and that the circuit court lacked the authority to grant Mr. Tatung's motion.

The hearing judge denied Mr. Tatung's motion, stating that the MARPC govern conduct of attorneys who are not licensed in Maryland but have an office in the state. The hearing judge also stated that "some of the acts could have occurred in Maryland[.]" After denying the motion, the hearing judge conducted the evidentiary hearing and made findings of facts and conclusions of law for this Court to review.

### E.    Hearing Judge's Legal Conclusions

As noted *supra*, the hearing judge concluded that Mr. Tatung violated Rule 1.1, Rule 1.3, Rule 1.5, Rule 8.1(a), and Rule 8.4 (a), (c), and (d) in connection with his representation of his clients in the federal immigration proceedings. The hearing judge concluded that Bar Counsel had failed to prove violations of Rule 1.4, Rule 1.15, Rule 3.3, and BOP § 10-304.[21]

---

[21] As previously noted, the hearing judge concluded that Mr. Tatung did not violate Rule 1.15 pertaining to trust account obligations. *See* note 4 *supra*. The hearing judge also concluded that Mr. Tatung did not violate Rule 1.4 concerning client communications. In his conclusion that there was no violation of Rule 1.4, the hearing judge stated that:

16

*Rule 1.1 (Competence)*

Rule 1.1 provides that "[a]n attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." With respect to Rule 1.1, the hearing judge stated that "the evidence in this case clearly shows that [Mr. Tatung] had the requisite skill and knowledge to handle these matters for the clients[,]" observing that he had "practiced immigration law for many years and testified that he averaged approximately three hundred (300) cases a year." The hearing judge further commented on Mr. Tatung's testimony that he had appeared in the federal immigration court in El Paso, Texas on at least two to three other occasions. Despite Mr. Tatung's knowledge and skill, the hearing judge concluded that Mr. Tatung violated Rule 1.1 by failing to check to see if

---

> This Court finds that Mr. Tatung did maintain adequate communication with Ms. Amasioni and Ms. Khan during his representation of his clients. This Court understands the communication challenges presented when clients are detained. However, sufficient evidence was provided during the hearing to establish that Mr. Tatung maintained a steady line of communication with Ms. Amasioni and Ms. Khan and did meet with each client for a period of one hour prior to all court appearances. Mr. Tatung also maintained an[] adequate line of communication with the third-party members assisting the clients outside of detention.

The hearing judge also concluded that Mr. Tatung did not violate Rule 3.3(a) governing candor toward the tribunal, which states, in pertinent part, that "[a]n attorney shall not knowingly: [] offer evidence that the attorney knows to be false. If an attorney has offered material evidence and comes to know the falsity, the attorney shall take remedial measures." The hearing judge concluded that Bar Counsel failed to establish by clear and convincing evidence that Mr. Tatung filed the attestation affidavit in Ms. Khan's case with knowledge that it did not pertain to her foreign affidavits. No exceptions were filed to these conclusions.

17

Judge Abbott had any standing orders concerning telephonic participation at master calendar hearings.[22]

---

[22] The hearing judge concluded that other conduct by Mr. Tatung violated Rule 1.1. Mr. Tatung filed exceptions to these additional conclusions. Had we not dismissed these charges, we would have sustained Mr. Tatung's exceptions as follows.

The hearing judge concluded that Mr. Tatung violated Rule 1.1 by knowingly accepting the clients' case "when he already had another matter scheduled on the same day." We do not find that this conduct violated Rule 1.1. It is clear that when Mr. Tatung accepted the representation, he thought he could attend the Texas master calendar hearing by telephone, promptly made this request, and notified the Texas immigration court of the scheduling conflict. These circumstances do not reflect a lack of competence.

The hearing judge commented on the fact that the immigration court denied Mr. Tatung's request to appear telephonically on August 14, 2017, and that the order had been mailed to Mr. Tatung's address. On these facts, the hearing judge stated that he had "a hard time believing [Mr. Tatung] when he states he was unaware of the Court's denial of his telephone request." We do not share the hearing judge's disbelief, nor would we conclude that Mr. Tatung knew that the immigration judge denied his request simply because a written order was signed by an immigration judge in Texas on August 14 and mailed to Mr. Tatung's office in Maryland.

The hearing judge also concluded that Mr. Tatung violated Rule 1.1 because he submitted "a partial application for asylum and was planning to supplement the application at a later date," which the hearing judge acknowledged, in fact, occurred. We would not find that Mr. Tatung's submission of a partial application constituted a violation of Rule 1.1. As described in note 5 *supra*, Mr. Tatung took over this case from prior counsel. A master calendar hearing was scheduled in one month's time, and the foreign affidavits necessary to substantiate his clients' applications had not even been signed in Cameroon, let alone delivered to Mr. Tatung in Maryland. Under these facts, Mr. Tatung was faced with a Hobson's choice—submit a partial application in advance of the master calendar hearing or submit nothing at all and wait until he had the affidavits. Had we not dismissed the charges to which these facts pertain, we would not second-guess his legal strategy of submitting a partial application prior to the master calendar hearing where the consequences for failure to submit anything might have resulted in his clients' deportation.

After commenting on Mr. Tatung's partial asylum submission, the hearing judge made the following conclusions:

18

The hearing judge also determined that Mr. Tatung's representation fell below the standard for threshold competence by his action in submitting the same affidavit of attestation in both of his clients' cases when it only pertained to one client.

*Rule 1.3 (Diligence)*

Rule 1.3 states that "[a]n attorney shall act with reasonable diligence and promptness in representing a client." The hearing judge concluded that Mr. Tatung lacked diligence in his representation of the clients in the immigration proceedings, and therefore

---

The problem is that when you approach the filing of pleadings in that manner, mistakes happen. Because care and diligence were not used at the outset, the same letter of attestation was used in both cases, even though it applied to only one of the clients and most of [Mr. Tatung's] arguments to the [immigration] [c]ourt were submitted *after* two merits hearings had been held, thus were not ultimately considered. The notion that any court, including the [i]mmigration [c]ourt would consider evidence submitted in a closing statement, when it was not subject to scrutiny, and cross-examination is negligent.

(Emphasis in original). Mr. Tatung excepts to the hearing judge's conclusion that he violated Rule 1.1 by filing a written submission summarizing his legal analysis of the social group issue. If we were not dismissing this case, we would sustain this exception. As we explained in notes 17 and 18 *supra*, the analysis of social groups was not "evidence" that Mr. Tatung failed to admit into the record—it was a *legal argument* that was submitted at the immigration judge's specific request. Moreover, there is no evidence in this record to support the hearing judge's conclusion that the legal argument pertaining to social groups was "not ultimately considered[]" by Judge Abbott. To the contrary, Judge Abbott's written denial of the asylum application clearly reflects that he considered Mr. Tatung's arguments pertaining to his clients' social groups, but that the social groups did not fit within the recognized federal law that would entitle the clients to asylum.

We note that Mr. Tatung filed a supplemental and cumulative expert report and requested that Judge Abbott consider it in connection with the social group issue. Judge Abbott did not accept the expert report. Based upon our independent review of the record, Mr. Tatung had not received the report until after the merits hearing, and it appears to be cumulative. Given Judge Abbott's specific comments concerning the novel legal issue, we would not second-guess Mr. Tatung's attempt to provide Judge Abbott with additional evidence to support the social group issue.

19

violated Rule 1.3 based upon the same factual findings that he found to support a violation of Rule 1.1—by failing to review the attestation affidavit and discovering that it did not apply to Ms. Khan's witnesses prior to filing it in her case, and by failing to review Judge Abbott's standing order to determine whether he could appear by telephone for the master calendar hearing.[23]

*Rule 1.5 (Fees)*

Rule 1.5 provides, in pertinent part, that "[a]n attorney shall not make an arrangement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." The hearing judge concluded that Mr. Tatung violated Rule 1.5 when he requested additional funds for representing the clients prior to the May 2018 merits hearing. The hearing judge explained that "[i]t is clear from the testimony, evidence presented and the communication between the parties, that Mr. Tatung came up with the $5,000.00 flat fee for both [clients] based on a calculation that each appearance in El Paso, Texas would

---

[23] The hearing judge also made additional legal conclusions with respect to Rule 1.3 to which Mr. Tatung excepts. In his conclusions concerning a Rule 1.3 violation, the hearing judge stated that "Mr. Tatung drew an unreasonable conclusion that he could submit an incomplete asylum application under the reliance [sic] that the immigration court would allow him to amend it at a later time." Had we not dismissed the charges related to the immigration proceeding, we would sustain Mr. Tatung's exception. As we explain in notes 5 and 22, *supra*, we would not conclude that Mr. Tatung's action in submitting a partial application under the circumstances constituted a lack of reasonable diligence or promptness in representing his clients. We further note that Mr. Tatung did in fact supplement the application, and that the supplemental information was considered by the immigration court.

The hearing judge also determined that Mr. Tatung's decision to summarize his clients' social groups in his written closing submission violated Rule 1.3. We would sustain Mr. Tatung's exception to the hearing judge's conclusions regarding the Rule 1.1 violation on that point.

be worth $2,500.00 and that the case would require two visits to El Paso." The hearing judge concluded that Mr. Tatung's "shortcoming" was that he was not aware that he would not be permitted to appear by telephone at a master calendar hearing, and further concluded that it was Mr. Tatung's failure to file the affidavit of attestation prior to the December merits hearings that caused the merits hearings to be rescheduled. The hearing judge concluded that "the additional costs were not incurred because of unforeseen problems in the individual cases, but rather, due to Mr. Tatung's failure to properly identify the amount of work the cases would require when he agreed to the flat fee and his own lack of diligence in identifying the rules of the court in which the cases were being held." The hearing judge therefore concluded that "Mr. Tatung's request for an additional $2,500.00 from each party was unreasonable and a violation of [Rule 1.5]."[24]

*Rule 8.1(a) (Bar Admission)*

Rule 8.1(a) provides, in pertinent part, that an attorney, "in connection with a disciplinary matter, shall not: [] knowingly make a false statement of material fact[.]" The hearing judge concluded that Mr. Tatung violated Rule 8.1(a) in connection with the

---

[24] Mr. Tatung filed an exception to this conclusion. Had we not dismissed the charges to which this exception pertains, we would have overruled his exception. Mr. Tatung accepted this case on a fixed fee, which included his travel expenses. Although there may be instances in which it may be reasonable for an attorney to request additional fees, we determine that it was not reasonable here. Mr. Tatung was required to make an additional trip to Texas because he had not obtained the attestation affidavit, which Judge Abbott discovered during the merits hearing. Under the circumstances, it was not reasonable for Mr. Tatung to charge his clients additional fees that were generated by his carelessness.

21

disciplinary investigation. Bar Counsel and Mr. Tatung each filed exceptions to these conclusions, which we discuss in Part IV.F, *infra*.

*Rule 8.4(a) (Misconduct)*

Rule 8.4(a) provides in pertinent part, that "[i]t is professional misconduct for an attorney to violate or attempt to violate" the MARPC. Under this Rule, if an attorney violates any professional rule, a violation of Rule 8.4(a) follows. The hearing judge concluded that Mr. Tatung had violated the MARPC, ergo he also concluded that a violation of Rule 8.4(a) had occurred.[25]

---

[25] In addition to Rule 8.4(a), the hearing judge also concluded that Mr. Tatung's conduct in the immigration proceedings violated Rule 8.4(c). Had we not dismissed the charges for which this conduct pertains, we would have sustained Mr. Tatung's exception. Rule 8.4(c) provides that "it is professional misconduct for an attorney to: . . . engage in conduct involving dishonestly, fraud, deceit or misrepresentation." The hearing judge determined that Mr. Tatung violated this rule by: (1) "misrepresenting to the client about the fee structure in this case[;]" (2) failing to attend the August 23, 2017 master calendar hearing; and (3) by taking the clients' cases with knowledge that he had a scheduling conflict "without knowing whether he would be available to handle the matter." The hearing judge's legal conclusion that these facts constituted a Rule 8.4(c) violation are not supported by clear and convincing evidence. As described *supra*, Mr. Tatung was careless in his failure to ascertain whether Judge Abbott had a standing order that prohibited telephonic participation at a master calendar hearing. Mr. Tatung was also careless when he agreed to represent the clients on a fixed fee basis, which included travel expenses, without taking into account that he might need to make more than two trips to Texas. But such careless mistakes are not tantamount to misrepresentations. Moreover, we do not conclude that Mr. Tatung violated Rule 8.4(c) by taking the clients' cases when he knew that he had another immigration case in Baltimore on the same day, given that his testimony was that he thought he could attend the Texas hearing by telephone, and the Texas court filings reflect that he apprised the Texas court of his scheduling conflict when he requested permission to appear telephonically.

*Rule 8.4(d) (Misconduct)*

Rule 8.4(d) states that it is a violation of the Maryland professional conduct rules to "engage in conduct that is prejudicial to the administration of justice[.]" The hearing judge concluded that Mr. Tatung's conduct in his representation of his clients in the Texas immigration proceedings violated Rule 8.4(d).[26]

## IV

## Discussion

We first take up Mr. Tatung's choice of law issue—whether the Commission's decision to charge him under the MARPC for conduct arising from this representation of

---

[26] In finding that Mr. Tatung's representation of the clients violated Rule 8.4(d), the hearing judge concluded that:

> The totality of Mr. Tatung's conduct . . . reflects conduct that is clearly prejudicial to the administrative of justice. When an attorney displays such a lack of competence with respect to handling his client's matters, fails to take accountability for his own diligence, [and] fails to attend a hearing, the Court can only conclude that this conduct jeopardizes public confidence in the profession and imperils the reputations of attorneys as a whole.

Had we not dismissed these charges based upon the choice of law argument that Mr. Tatung raised, we would have upheld the Rule 8.4(d) violation. Mr. Tatung made mistakes by: (1) failing to inquire into the immigration court's standing orders on telephonic appearances at master calendar hearings, which resulted in his non-appearance; (2) failing to discover that the attestation affidavit was specific to only Ms. Amasioni's witness affidavits and not to both clients' witness affidavits; and (3) entering into a fixed fee agreement that included travel expenses that did not account for the possibility that he would be required to make additional trips to Texas, and then asking for more money to cover his expenses (which we determine to be unreasonable under the circumstances). Such mistakes can undermine the public's confidence in the legal profession. That being said, we would have sustained Mr. Tatung's exceptions to the judge's sweeping conclusions of "such a lack of competence" on Mr. Tatung's part, as well as his failure "to take accountability for his own diligence." Those conclusions are not supported by clear and convincing evidence. Elsewhere in his findings of fact, the hearing judge commented

23

his clients in the federal immigration proceedings in Texas complied with Rule 8.5(b).[27]

Before we do this, it is useful to point out that this case *does not concern* whether Maryland has *jurisdiction* to undertake disciplinary proceedings against Mr. Tatung for alleged misconduct that occurred in Texas. Rule 8.5(a) states that:

> A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs. *A lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction.* A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction for the same conduct.

(Emphasis added). Mr. Tatung does not dispute Maryland's jurisdiction to undertake a

---

on Mr. Tatung's "skill and knowledge" in immigration matters. The record in this case reflects Mr. Tatung's overall competence, including a thorough presentation on behalf of his clients seeking asylum on a novel and unsettled legal issue. Moreover, the record also reflects that Mr. Tatung accepted responsibility for the mistakes he made pertaining to his failure to attend the master calendar hearing and the incorrect filing of the attestation affidavit in one of the client's cases. Based upon our independent review of this record, we do not find by clear and convincing evidence that Mr. Tatung failed to take responsibility for these mistakes. One can own up to his or her mistakes, but also explain the circumstances in which the errors arose. That is different from refusing to take responsibility for one's actions and blaming others. We determine that Mr. Tatung's explanations of his mistakes in this instance fall into the former category and not the latter.

[27] At the oral argument in this matter, Bar Counsel argued that Mr. Tatung had waived the choice of law issue by failing to raise it in his answer. We disagree that this matter was waived. Mr. Tatung addressed the issue by written motion prior to the evidentiary hearing. Bar Counsel did not assert waiver at that time and addressed the substance of the argument. Given this Court's original jurisdiction over attorney discipline matters, Bar Counsel argued that the issue could only be addressed by the Court of Appeals. The hearing judge agreed, denied the motion and proceeded with the evidentiary hearing. Counsel for Mr. Tatung preserved the legal issue on the record, which was noted by the hearing judge. Under the circumstances, we determine that there was no waiver.

disciplinary proceeding.[28]  Mr. Tatung has a law office in Maryland and practices law in immigration courts in this State.  This case presents a legal issue unrelated to jurisdiction— specifically, *which professional rules govern* Mr. Tatung's conduct in two client matters arising in connection with federal immigration proceedings in Texas.  That discussion takes us to section (b) of Rule 8.5.

### A.    MARPC 8.5(b)—Choice of Law Provisions

While section (a) of Rule 8.5 addresses Maryland's jurisdictional authority to undertake disciplinary proceedings in matters involving attorney misconduct that occurs outside of Maryland, section (b) establishes the applicable choice of law provisions that apply to such cases.  Specifically, Rule 8.5(b) states:

> In any exercise of the disciplinary authority of this State, the rule of professional conduct to be applied *shall be as follows*:
>
> (1) for conduct in connection with a matter pending before a tribunal,[29] the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and
>
> (2) for any other conduct, the rules of the jurisdiction in which the attorney's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct.  An attorney shall not be subject to the discipline if the attorney's conduct conforms to the rules of a jurisdiction in which the

---

[28] Our jurisdiction and authority over attorneys who are not barred in Maryland but who nonetheless maintain an office in our state is settled.  *See Attorney Grievance Comm'n v. Ndi*, 459 Md. 42 (2018) (citing Rule 8.5(a) and noting that when an out-of-state attorney chose to practice in Maryland, he "subjected that practice to the consumer protection statutes that govern legal practice in Maryland").

[29] The MARPC defines "tribunal" as "denot[ing] a court, an arbitrator in a binding arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity."

> attorney reasonably believes the predominant effect of the attorney's conduct will occur.

(Emphasis added). The parties disagree over the interpretation of the choice of law rules set forth in Rule 8.5(b). Mr. Tatung argues that, under subsection (b)(1), because the conduct at issue occurred in connection with a federal immigration proceeding in Texas, the Commission was required to apply the federal immigration professional rules, and that it was not proper for the Commission to charge him with violating the MARPC. Bar Counsel asserts that it was appropriate to charge Mr. Tatung under the MARPC because he has an office in Maryland, and during the course of representing his clients in the Texas immigration proceeding, he conducted business from his office (such as taking telephone calls and mailing pleadings). Bar Counsel further asserts that it is only required to apply the professional rules of another jurisdiction where there is a conflict between the MARPC and the professional conduct rules in another jurisdiction.

Although the choice of law provisions have been part of our professional conduct rules since 2005, this is the first instance in which an attorney has squarely challenged charges filed under the MARPC based upon the interpretation and meaning of Rule 8.5(b)(1).[30] When we interpret the Maryland Rules, we apply the same rules of

---

[30] Several of our attorney disciplinary proceedings have involved allegations of misconduct in connection with out-of-state immigration proceedings or other litigation matters before another tribunal, however, no other attorney has raised the choice of law issue in the same manner as it has been raised by Mr. Tatung here. Although the issue was raised in *Attorney Grievance Comm'n v. Zhang*, 440 Md. 128, 146–47 (2014), the arguments and our discussion were focused on the application of the "predominant effect" language in Rule 8.5(b)(2), and not the application of Rule 8.5(b)(1). Of course, under Rule 8.5(b)(2), any consideration of the "predominant effect" of an attorney's conduct will depend upon the facts and circumstance of the particular representation at issue.

construction that we use to interpret statutes. *Gen. Motors Corp. v. Seay*, 388 Md. 341, 352 (2005). The "goal of our examination is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Id.* (quoting *Davis v. Slater,* 383 Md. 599, 605 (2004)). Given that this Court promulgates the Maryland Rules, we must ascertain our own intent from the language of the rule. We start with the plain meaning of the statute. If it's clear and unambiguous, we need not look beyond the language of the rule to inform our analysis. *Lisy Corp. v. McCormick & Co., Inc.*, 445 Md. 213 (2015). However, the goal of our examination is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular rule. *Id.* at 221. "To that end, we must consider the context in which the [] rule appears, including related statutes or rules, and relevant legislative history." *Id.* (citations omitted).

### 1. *The Genesis of Rule 8.5(b) Choice of Law Provisions*

Maryland Rule 8.5(b) was added by a rules order of this Court in February 2005 after a comprehensive study and review of our rules of professional conduct, in light of changes that had been made in 2000 to the ABA Model Rules. The ABA model rules were overhauled in 2000 in response to recommendations from an ABA commission known as "the Commission on Evaluation of the Rules of Professional Conduct" (commonly referred to as the "Ethics 2000 Commission"). In April 2002, this Court appointed its own committee to examine the 2000 changes to the ABA Model Rules and to recommend what changes, if any, would be appropriate to incorporate into the Maryland Rules of Professional Conduct. Our committee, which we so aptly named "The Select Committee

27

Appointed by the Court of Appeals to Study the Ethics 2000 Amendments to the ABA Model Rules of Professional Conduct," (the "Select Committee") did just what was contemplated by its lengthy title. The Select Committee undertook a wholesale examination of our professional conduct rules and the ABA Model Rules, which included study and research, and consideration of significant public comments. The work of the Select Committee was ultimately formalized in a "Report of the Select Committee," dated December 16, 2003. In its Report, the Select Committee made detailed recommendations concerning whether to retain the existing language in the Maryland professional conduct rules, or whether to incorporate the language from the ABA Model Rules. For some rules, the Committee recommended retaining part of the existing language, and incorporating parts of the ABA Model Rule.

After considering the Report, this Court adopted the proposed Maryland Lawyers' Rules of Professional Conduct, including the Comment to each Rule, with an effective date of July 1, 2005. This Court adopted Rule 8.5(b), as well as the Comments to that Rule, as recommended by the Select Committee in its Report. Unlike some of the other rules that were not wholesale adoptions of the ABA Model Rules, the choice of law provisions that we adopted in our Rule 8.5(b) *were* virtually identical to the Model ABA Rule 8.5(b). *See* Comments to Maryland Rule 8.5(b) (noting that Maryland Rule 8.5(b) "is substantially similar to ABA Model Rule 8.5(b)" and the comments to our rule are also "substantially similar to the ABA comments"). Because our Rule 8.5 is substantially similar to the ABA Model Rule 8.5, it is useful to describe the evolution of that Model Rule in the years leading up to this Court's adoption of Rule 8.5(b) in 2005.

28

## 2. The Legislative History and Evolution of ABA Model Rule 8.5

In the latter part of the twentieth century, the national market for legal services expanded along with the American economy. Clara C. Ward, *The Law of Choice: Implementation of ABA Model Rule 8.5*, 30 J. Legal Prof. 173 (2005-2006). This expansion resulted in an increase of attorneys practicing in more than one jurisdiction. *Id.* (citing ABA Comm'n on Multijurisdictional Practice, *Client Representation in the 21st Century 1* (2002)). As it became more commonplace that attorneys were licensed in more than one state, the ABA Model Rules were amended to recognize this trend. ABA Model Rule 8.5 was adopted in 1983, and simply stated that "[a] lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction although engaged in practice elsewhere." *See* Ann. Mod. Rules. Prof. Cond. § 8.5 (9th Ed. 2019). "In 1993, the rule was amended to clarify that a lawyer admitted in more than one jurisdiction is subject to the disciplinary authority of each licensing jurisdiction for the same conduct." *Id.* As part of the 1993 amendments, choice of law provisions were also added. *Id.* The rule was amended again in 2002. As noted, in 2005, we adopted the 2002 iteration of the ABA Model Rule 8.5, as well as the comments, and any slight variations are non-substantive.[31]

The comments to Rule 8.5 explain the purpose behind the rule, as well as the manner in which it is intended to be applied. The first comment addresses the jurisdiction of the

---

[31] ABA Model Rule 8.5 provides as follows:

(a) Disciplinary Authority. A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where

disciplinary authority embodied in Rule 8.5(a)—recognizing "the longstanding law that conduct of an attorney admitted to practice in this State is subject to the disciplinary authority of the State." *See* Maryland Rule 8.5, cmt.1. The comments further explain that the "[e]xtension of the disciplinary authority of this State to other attorneys who provide or offer to provide legal services in this State is for the protection of the citizens of this State." *Id.*

---

the lawyer's conduct occurs. A lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction. A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction for the same conduct.

(b) Choice of Law. In any exercise of the disciplinary authority of this jurisdiction, the rules of professional conduct to be applied shall be as follows:

(1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and

(2) for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct. A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer reasonably believes the predominant effect of the lawyer's conduct will occur.

The differences between ABA Model Rule 8.5 and Maryland Rule 8.5 are non-substantive—such as the use of the word "attorney" instead of "lawyer," references to our State, and the Maryland Court of Appeals, etc. *Compare* Maryland Rule 8.5 with ABA Model Rule 8.5. The comments to our Rule 8.5 are also virtually identical to the comments to the Model Rule.

Rule 8.5(b) establishes the set of professional conduct rules that apply when an attorney practices in more than one jurisdiction—either by virtue of their physical presence or contacts with a particular jurisdiction, or their license to practice in more than one jurisdiction. In either circumstance, comment 2 explains that "[a]n attorney may potentially be subject to more than one set of rules of professional conduct that impose different obligations." Maryland Rule 8.5, cmt.2. The choice of law provisions established by Rule 8.5(b) recognize that "[t]he attorney may be licensed to practice in more than one jurisdiction with differing rules, or may be admitted to practice before a particular court with rules that differ from those of the jurisdiction or jurisdictions in which the attorney is licensed to practice. Additionally, the attorney's conduct may involve significant contacts with more than one jurisdiction." *Id.*

Comment 3 explains that subsection (b) "seeks to resolve potential conflicts" in the professional conduct rules between the jurisdictions based upon the "premise . . . that minimizing conflicts between the rules, as well as uncertainty about which rules are applicable, is in the best interest of both clients and the profession (as well as the bodies having authority to regulate the profession)." Accordingly, subsection (b)

> takes the approach of (i) providing that any particular conduct of a lawyer *shall be subject to only one set of rules of professional conduct*, (ii) *making the determination of which set of rules applies to particular conduct as straightforward as possible*, consistent with recognition of appropriate regulatory interests of relevant jurisdictions, and (iii) providing protection from discipline for lawyers who act reasonably in the face of uncertainty.

Rule 8.5, cmt. 3 (emphasis added).

31

### 3. *Deconstructing the Plain Language of Rule 8.5(b)*

Rule 8.5(b) divides multi-jurisdictional conduct into two categories—conduct that occurs in connection with a matter pending before a tribunal, and "other" conduct.

### Rule 8.5(b)(1)— Conduct that Occurs in Connection with a Matter Pending Before a Tribunal

Rule 8.5(b)(1) states that when misconduct occurs in connection with a matter pending before a tribunal, the disciplinary authority "shall" apply the professional conduct rules of the jurisdiction in which the tribunal sits, unless the tribunal's own rules specify otherwise. The plain language of subsection (b)(1)—which mandates the application of the rules of the tribunal where the conduct occurred—is confirmed by comment 4 (explaining that, where the "attorney's conduct relat[es] to a proceeding pending before a tribunal, *the attorney shall be subject only to the rules of professional conduct of that tribunal*") (emphasis added). Our sister states that have adopted similar versions of ABA Model Rule 8.5(b)(1) have applied the rule consistent with its plain language. *See, e.g.*, *In re Lyons*, 780 N.W.2d 629 (Minn. 2010) (Minnesota disciplinary proceeding applying Montana ethics rules to misconduct in connection with federal court litigation in Montana, and Minnesota rules to misconduct during disciplinary proceedings); *In re Marks*, 665 N.W.2d 836 (Wis. 2003) (Wisconsin disciplinary proceeding applying the Michigan rules of professional conduct in connection with misconduct arising from the attorney engaging in frivolous litigation in Michigan court); *In re Ponds*, 888 A.2d 234 (D.C. 2005) (District of Columbia disciplinary proceeding applying the Maryland professional rules of conduct where the attorney's misconduct occurred in a Maryland case); *see generally* Andrea Lynn

Evenson, *Disciplining Out-of-State Conduct and Lawyers Licensed in Other States*, 15

Prof. Law., no. 1 at 12 (Spring 2004).[32]

---

[32] In *Attorney Grievance Commission v. Zhang*, 440 Md. 128 (2014), we disbarred a Ms. Zhang, a Maryland attorney, for conduct arising from a divorce matter in Virginia where she was not licensed. We applied the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), which were in effect when the alleged misconduct occurred. Ms. Zhang moved to dismiss on the grounds that the MLRPC did not apply to her conduct and that the petition for disciplinary or remedial action filed by Bar Counsel was not sufficiently clear. *Id.* at 146. In concluding that the MLRPC applied, we relied on Rule 8.5(b)(2) and determined that a "substantial part of Ms. Zhang's conduct . . . occurred in Maryland." *Id.* We rejected Ms. Zhang's contention that the MLRPC did not apply to her conduct that occurred in the Virginia litigation. The focus of our analysis was Rule 8.5(b)(2) and whether the "predominant effect" of Ms. Zhang's conducted occurred in Maryland. *Id.* at 147 n.5. After examining the conduct that occurred in Maryland, we "found no grounds on which to alter the determination that the MLRPC" applied to the conduct.

We also rejected Ms. Zhang's argument that the Virginia professional rules should apply under Rule 8.5(b)(1) because the divorce matter was filed in Virginia. *Id.* We concluded, in a single sentence and without any analysis, that the choice of law provisions in Rule 8.5(b)(1) did not apply because Bar Counsel filed charges after the Virginia case had concluded. *Id.* We determine that this conclusory statement was too narrow. Based upon our interpretation of the language of Rule 8.5(b)(1), as well as the comments to that subsection, we determine that the application of Rule 8.5(b)(1) is not simply limited to the time period during which a matter before another tribunal is ongoing. It is not logical to interpret Rule 8.5(b)(1) to require that the disciplinary authority apply another tribunal's professional rules to analyze conduct while it is *ongoing*, but permit the disciplinary authority to retrospectively apply our professional rules to review the *same conduct* after the proceeding before the tribunal has concluded. Additionally, we observe that the disciplinary authorities who, like Maryland, have adopted the same choice of law provisions contained in ABA Model Rule 8.5(b)(1), do not interpret that subsection so narrowly. *See, e.g.*, *In re Lyons*, 780 N.W.2d 629 (Minn. 2010) (Minnesota disciplinary proceeding applying Montana ethics rules to misconduct in connection with federal court litigation in Montana after the federal proceeding had concluded); *In re Marks*, 665 N.W.2d 836 (Wis. 2003) (Wisconsin disciplinary proceeding applying the Michigan rules of professional conduct in connection with misconduct in frivolous litigation in Michigan court that had concluded); *In re Ponds*, 888 A.2d 234 (D.C. 2005) (District of Columbia disciplinary proceeding applying the Maryland professional rules of conduct where the attorney's misconduct occurred in a Maryland federal case that had concluded).

<u>Rule 8.5(b)(2)—"Other" Conduct</u>

Rule 8.5(b)(2) applies to "other conduct"—in other words, conduct that does *not* occur in connection with a matter pending before a tribunal. In such instances, the disciplinary authority of this State "shall" apply "the rules of the jurisdiction in which the attorney's conduct occurred *or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct*." (Emphasis added). The rule further provides that "[a]n attorney shall not be subject to discipline if the attorney's conduct conforms to the rules of a jurisdiction in which the attorney reasonably believes the predominant effect of the attorney's conduct will occur." Rule 8.5(b)(2). Comment 4 explains how this subsection is intended to be applied:

> As to all other conduct [not occurring in connection with a matter before a tribunal], *including conduct in anticipation of a proceeding not yet pending before a tribunal*, subsection (b)(2) of this Rule provides that an attorney shall be subject to the rules of the jurisdiction in which the attorney's conduct occurred, or, *if the predominant effect of the conduct is in another jurisdiction, the rules of that jurisdiction shall be applied to the conduct*. In the case of conduct in anticipation of a proceeding that is likely to be before a tribunal, the predominant effect of such conduct could be where the conduct occurred, where the tribunal sits or another jurisdiction.

(Emphasis added).

Like the application of Rule 8.5(b)(1) discussed above, we observe that our sister states that have adopted similar versions of subsection (b)(2) based upon the ABA Model Rule have applied the rule consistent with its plain language and consistent with comment 4. *See, e.g.*, *In re Vega*, 241 So.3d 993, 995 n.2 (La. 2018) (Louisiana court applying Texas ethics rules under the "predominant effect" criteria in Rule 8.5(b)(2) because a Louisiana lawyer's "misconduct occurred in Texas"); *In re Schiller*, 808 S.E.2d 378, 379 n.1 (S.C.

34

2017) (South Carolina court applying North Carolina professional rules to attorney's conduct under the "predominant effect" language of Rule 8.5(b)(2) while representing a North Carolina citizen involved in a car accident in North Carolina); *In re Overboe*, 745 N.W.2d 852 (Minn. 2008) (Minnesota court applying North Dakota ethics rules for violations involving trust account where attorney practiced and had bank accounts in North Dakota and applying Minnesota rules to the allegations of failure to cooperate with disciplinary authorities).

Comment 5 explains the manner in which conflicts should be resolved if the conduct could involve the application of professional rules of more than one jurisdiction:

> When an attorney's conduct involves significant contacts with more than one jurisdiction, it may not be clear whether the predominant effect of the attorney's conduct will occur in a jurisdiction other than the one in which the conduct occurred. So long as the attorney's conduct conforms to the rules of a jurisdiction in which the attorney reasonably believes the predominant effect will occur, the attorney shall not be subject to discipline under this Rule.

Finally, in recognition that multiple jurisdictions or tribunals have jurisdiction to discipline an attorney for the same conduct, comment 6 to Rule 8.5(b) provides as follows:

> If two admitting jurisdictions were to proceed against an attorney for the same conduct, they should, applying this Rule, identify the same governing ethics rules. They should take all appropriate steps to see that they do apply the same rule to the same conduct, and in all events should avoid proceeding against an attorney on the basis of two inconsistent rules.

**B.     *Application of Rule 8.5(b)(1) to Mr. Tatung's Conduct Involving the Representation of his Clients in the Texas Immigration Proceeding***

Applying Rule 8.5(b)(1) to Mr. Tatung's conduct, it is undisputed that, other than allegations of misconduct arising from Bar Counsel's investigation (which we discuss more

fully below), the conduct occurred in connection with the federal immigration court proceeding in Texas. Mr. Tatung's alleged misconduct involved his: failure to inquire whether Judge Abbott had a standing order that addressed telephonic appearances at master calendar hearings, and his resultant failure to attend the master calendar hearing; filing an attestation affidavit purporting to authenticate foreign witness affidavits in both of his clients' immigration cases where it only applied to one immigration case (and failing to discover the error, bring it to Judge Abbott's attention, or otherwise correct it in the immigration court's file); and renegotiating his fixed fee agreement to require the clients' relatives to cover additional expenses associated with unanticipated trips to Texas occasioned by his failure to file the authentication affidavit required by Judge Abbott prior to the merits hearing.

Under the facts of this case, we further determine that even where Mr. Tatung's conduct did not physically occur in Texas—for example, Mr. Tatung's action in communicating by telephone in Maryland with the clients' relatives in Ohio, or filing the attestation affidavit from Maryland into the federal immigration court—the conduct nonetheless occurred "in connection with" the Texas immigration proceeding. Rule 8.5(b)(1). Under the plain language of Rule 8.5(b)(1), the misconduct arose in connection with a matter pending before the federal immigration tribunal in Texas. Accordingly, the "rules of the jurisdiction where the tribunal sits" shall apply "unless the rules of the tribunal provide otherwise." *Id.* Because our choice of law rules direct us to the federal immigration professional rules, we turn to them next.

36

*C.* *Federal Regulations Establishing Professional Conduct Rules for Immigration Attorneys*

In June 2000, the EOIR[33] implemented a regulation titled "Professional Conduct for Practitioners—Rules and Procedures," to protect the public, preserve the integrity of immigration proceedings and adjudications, and maintain high professional standards among immigration practitioners. 8 C.F.R. § 1003.102. In August 2006, the Department of Justice ("DOJ") developed measures to improve the quality of the immigration courts and the BIA.[34] As a result of one of these measures, the EOIR promulgated changes to the rules governing professional conduct and disciplinary proceedings for attorneys who represented clients before the EOIR. Professional Conduct for Practitioners—Rules and Procedures, and Representation and Appearances, 73 Fed. Reg. 76914 (Dec. 18, 2008) (codified at 8 C.F.R. pt. 1003). As part of the revisions, the language in the rule was expanded to add additional grounds for disciplinary sanctions that were intended to conform in many respects with the ABA Model Rules. The regulatory background for the added amendments reflects that the additions were adopted, in part, to fill gaps in the

---

[33] The EOIR is comprised of the Office of the Chief Immigration Judge, the Board of Immigration Appeals, the Office of the Chief Administrative Hearing Officer, the Office of General Counsel, and administrative components. 8 C.F.R. §§ 1003.0, 1003.9.

[34] Attorney General Gonzales, Memorandum on Measures To Improve the Immigration Courts and the Board of Immigration Appeals, August 9, 2006, at https://perma.cc/Y6YS-QDSW, and EOIR, Fact Sheet on EOIR's Improvement Measures—Progress Overview, September 8, 2008, at https://perma.cc/L87Y-DLZ6.

existing rules and to make them consistent with the ABA Model Rules, as well as the

ethical rules in most states:

> [T]he grounds for sanctionable misconduct have been revised to include language that is similar, and sometimes identical, to the language found in the ABA Model Rules, as such disciplinary standards are widely known and accepted within the legal profession. *Although EOIR does not seek to supplant the disciplinary functions of the various state bars*, this rule aims to strengthen the existing rules in light of the apparent gaps in the current regulation. In addition, *these revisions will make the EOIR professional conduct requirements more consistent with the ethical standards applicable in most states*.

73 Fed. Reg. 76915 (Dec. 18, 2008) (codified at 8 C.F.R. pt. 1003). (Emphasis added).[35]

The disciplinary grounds in the federal regulations are not intended to be exclusive

or exhaustive. *See* C.F.R. § 1003.102 (explaining that "[i]t is deemed to be in the public

interest for an adjudicating official or the Board to impose disciplinary sanctions against

any practitioner who falls within one or more" of the enumerated categories, but that "the

categories do not constitute the exclusive grounds for which disciplinary sanctions may be

imposed in the public interest[]").

In *Gadda v. Ashcroft*, 377 F.3d 934 (9th Cir. 2004), the Court of Appeals discussed

the federal regulations that established professional conduct rules for immigration

attorneys, as those regulations existed in 2004, in the context of a disciplinary proceeding

in which the attorney had raised federal preemption and jurisdiction as grounds for

---

[35] The disciplinary grounds that had been in place prior to the December 18, 2008 amendment were those enumerated at 8 C.F.R. § 1003.102(a)-(m). The amendments adding new grounds for disciplinary action are set forth in 8 C.F.R. § 1003.2(n)-(v) and address some of the fundamental basic standards embodied in the ABA Model Rules, such as competence, diligence, communications with clients, and engaging in conduct that is prejudicial to the administration of justice.

injunctive relief. Mr. Gadda, an immigration attorney, sought to enjoin the BIA and the United States Court of Appeals for the Ninth Circuit from imposing reciprocal discipline after the California Supreme Court entered an order suspending him based upon misconduct arising in immigration proceedings. Mr. Gadda argued that the federal law preempted "a state's authority to discipline or regulate the conduct of attorneys who, like him, practice exclusively in the immigration or federal courts[.]" *Gadda*, 377 F.3d at 944. Mr. Gadda argued that the California Supreme Court lacked jurisdiction to disbar him, and therefore, the BIA and the Ninth Circuit could not impose reciprocal discipline of disbarment based on the California Supreme Court's order of suspension. *Id.* at 939. The Court of Appeals rejected Mr. Gadda's argument, concluding that "federal law does not preempt the Supreme Court of California's authority to suspend or disbar attorneys admitted to practice in California state courts" and that the state court's discipline orders could "serve as the basis for reciprocal disbarment actions by both the BIA and this court." *Id.*

In rejecting Mr. Gadda's preemption argument, the Ninth Circuit pointed out that the federal regulations provide that "an attorney may represent a person in immigration proceedings only if the attorney is a member in good standing of the bar of the highest court of any State . . . and is not under any order of any court suspending, enjoining, restraining or disbarring, or otherwise restricting him in the practice of law." *Id.* at 944–45 (citing 8 C.F.R. §§ 1292.1(a)(1) and (e), 1001.1(f)) (internal quotations omitted). The Court stated that, "[b]eyond merely leaving room for supplementary state regulations, the immigration regulations *condition* an attorney's ability to practice in immigration court on

39

the attorney's good standing as a member of the bar of a state court." *Id.* at 945 (emphasis

in original). The Court further observed that "the immigration regulations expressly allow

for supplementary state regulation." *Id.* As examples of the supplementary regulations,

the Court noted that

> [a]bsent good cause, the BIA must immediately suspend an attorney who
> has been disbarred or suspended from practice on an interim or permanent
> basis by the highest court of any state, territory, the District of Columbia,
> or any federal court. 8 C.F.R. § 1003.103(a)(1), (2). An immigration
> attorney also has a duty to inform the EOIR if he or she has been disbarred
> or suspended by the highest court of any state or territory, or by a federal
> court. 8 C.F.R. § 1003.103(c). A final order of disbarment or suspension
> by a state or territory or federal court constitutes a rebuttable presumption
> that disciplinary sanctions should be imposed by the BIA. 8 C.F.R.
> § 1003.103(b)(2); *see* 8 C.F.R. §§ 1292.3(c)(3)(ii), 1003.102(e).

*Id.* The Ninth Circuit concluded that "[t]he immigration regulations thus promote reliance

on and cooperation with the states, territories, and federal courts. They seek to ensure that

qualified attorneys practice before the BIA, [i]mmigration [c]ourts, and the DHS, and that

their standards for practice are not contrary to the applicable disciplinary rules of other

jurisdictions." *Id.* The Court pointed out that the federal regulations adopted in 2000 "were

designed to implement uniform, nationwide rules of professional conduct for attorneys who

practice in the immigration courts; it does not posit that agency oversight is the sole means

of regulating attorney conduct." *Id.* Finally, the Court noted that the 2000 regulations

were intended to ensure cooperation between the federal immigration disciplinary process

and the disciplinary authorities of each state:

> EOIR . . . anticipate[s] working closely with the various state bars when
> investigating disciplinary complaints . . . . Cooperation between the federal
> government and the 51 state bar disciplinary authorities will optimize
> resources and minimize duplication of investigations. In general, state bars

have not been resistant to the Federal government's efforts to assist in protecting the public by scrutinizing the professional conduct of attorneys.

*Id.* at 946 (citing Professional Conduct for Practitioners; Rules and Procedures, 65 Fed. Reg. 39,513, 39,524 (June 27, 2000)).

The Ninth Circuit's examination of the federal regulations in *Gadda* related to arguments of jurisdiction and federal preemption—which, of course, are different legal concepts from the choice of law argument raised by Mr. Tatung. However, they are nonetheless instructive in explaining the purpose and intent of the EOIR's professional regulations—to establish uniform regulations that govern the professional conduct of immigration attorneys and to ensure that the regulations are applied in a manner consistent with state disciplinary authorities having jurisdiction over the same conduct.

### D. *General Comparison of the MARPC and the Federal Regulations*

Although the federal regulations, for the most part, cover many of the same basic minimum professional standards that are embodied in our MARPC, they are not mirror images of one another. *Compare* 8 C.F.R. § 1003.102(a)(1) (prohibiting an attorney from charging a fee that is "deemed to be grossly excessive") *with* MARPC 1.5(a)(1) (prohibiting an attorney from charging an "unreasonable fee"); *also compare* 8 C.F.R. § 1003.102(c) (stating that a professional violates the federal immigration professional rules where he or she "[k]nowingly or with reckless disregard makes a false statement of material fact or law, or willfully misleads, misinforms, threatens, or deceives any person . . . concerning any material and relevant matter related to a case, including knowingly or with reckless disregard offering false evidence[]") *with* Rule 8.4(c) (stating

41

that it is "professional misconduct for an attorney to: . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation[]"). In some instances, the federal regulations have more detailed examples of sanctionable conduct. For example, it is a violation of the federal regulations to "[k]nowingly or with reckless disregard falsely certif[y] a copy of a document as being a true and complete copy of an original[.]" 8 C.F.R. § 1003.102(i). It is also a violation to "[r]epeatedly fail[] to appear for pre-hearing conferences, scheduling hearings, or case-related meetings in a timely manner without good cause[.]" 8 C.F.R. § 1003.102(l). The federal regulations concerning competence and diligence contain more description in their respective regulations than the MARPC counterparts. *Compare* 8 C.F.R. §§ 1003.102(o) *with* MARPC 1.1; *also compare* 8 C.F.R. §§ 1003.102(q) *with* MARPC 1.3. Based upon our comparison of the federal regulations and the MARPC, in most, if not virtually all circumstances, a violation of the MARPC would be consistent with a violation of the federal regulations, and vice versa.

Although the federal regulations and the MARPC are consistent with one another, such a determination does not mean that we may ignore the plain language of the word "shall" in the choice of law provisions outlined in Rule 8.5(b). At the oral argument in this matter, Bar Counsel asserted that, where the conduct involves another tribunal or jurisdiction, it is only required to apply the rules of the alternative jurisdiction when there is a conflict. We disagree. Through the use of the word "shall," Rule 8.5(b) plainly and unambiguously mandates the application of the professional rules of the tribunal where the conduct arises in connection with a matter pending before a tribunal, and for "other conduct," the rules of the jurisdiction where the conduct occurred, *or the rules of the*

42

*jurisdiction where the predominant effect occurred.* The rule does *not* give the disciplinary authority the discretion to apply the rules of another tribunal jurisdiction *only* in the event of a conflict. "As we have often said, the Maryland Rules are 'precise rubrics' which are to be strictly followed." *Gen. Motors Corp. v. Seay,* 388 Md. 341, 344 (2005); *see also* Maryland Rule 1-201(a) (explaining that, "[w]hen a rule, by the word 'shall' or otherwise, mandates [] conduct, . . . the court may compel compliance with the rule or may determine the consequences of the noncompliance in light of the totality of the circumstances and the purpose of the rule[]").

Our interpretation of Rule 8.5(b) also ensures that, where an attorney's misconduct triggers jurisdiction and oversight by more than one disciplinary authority, the attorney is treated fairly and uniformly by each jurisdiction, as contemplated by the comments to that rule. For example, here, Mr. Tatung's conduct could be the subject of *several* disciplinary proceedings—in Maryland (where he is not licensed but maintains a physical office), in the District of Columbia (where he is licensed), in a BIA disciplinary proceeding (where the conduct arose),[36] or even in Texas (the state in which the conduct occurred). Indeed,

---

[36] The federal rules also include an independent disciplinary process. Any individual who believes that an immigration attorney has engaged in criminal, unethical, or unprofessional conduct while practicing before the EOIR may file a complaint with the EOIR Disciplinary Counsel. 8 C.F.R. § 1293. If the EOIR Disciplinary Counsel determines that the complaint has merit, and that formal disciplinary sanctions should be imposed, Counsel will initiate formal disciplinary proceedings before the BIA. The disciplinary sanctions that the BIA may impose include expulsion to practice before the BIA or immigration courts, suspension, public or private censure, or any other disciplinary action determined to be appropriate. 8 C.F.R. §§ 292.3, 1292.3, and 1003.101. There are also provisions for immediate suspension and summary disciplinary proceedings based on a conviction for a serious crime, or disbarment/suspension imposed by the highest court of a state or any federal court. 8 C.F.R. §§ 292.3(c), 1292.3(c), 1003.102.

43

our example is not simply a hypothetical—it actually occurred. In its decision denying the ineffective assistance claims filed by Mr. Tatung's clients, the BIA noted that, after Mr. Tatung's clients learned that he was not licensed in Maryland, they withdrew their Maryland complaints and re-filed them in the District of Columbia. As comment 6 instructs, it is important for the disciplining jurisdictions to apply the same professional rules to the alleged misconduct to avoid any inconsistencies. *See* Rule 8.5, cmt. 6. Of course, each jurisdiction also has the authority to impose reciprocal discipline.

Here, the federal immigration professional rules promulgated under 8 C.F.R. § 1003.102 clearly apply to the proceedings before the federal immigration tribunal. Under Rule 8.5(b)(1), any charges filed by the Commission for misconduct arising in connection with the matter pending before the tribunal should have been filed under those rules. Even if the misconduct did not arise during a court proceeding (for example, negotiating a fee agreement for representation in the immigration proceedings), the misconduct occurred "in connection with" the federal immigration proceeding. Moreover, even if the conduct had not fallen within Rule 8.5(b)(1), the conduct would have been subject to the "predominant effect" test under Rule 8.5(b)(2). Maryland's connection to the specific conduct in this case is limited to Mr. Tatung having a physical office in Maryland (where he exclusively practices immigration law). The clients and their relatives were not Maryland residents, Mr. Tatung did not meet with them in the State, and the conduct occurred exclusively in a federal immigration court in Texas.

Bar Counsel argues that it was appropriate to charge Mr. Tatung because he has an office here and filed papers from Maryland. We disagree. We conclude that such an

interpretation would ignore the plain language of Rule 8.5(b)(1). Bar Counsel's interpretation would also conflict with the "predominant effect" analysis under Rule 8.5(b)(2), which requires more than simply applying a litmus test of whether the attorney has an office in Maryland from which he worked and filed pleadings by mail or e-filing, in a court in another jurisdiction. That analysis is too simplistic and amounts to no analysis at all. We will not negate the plain language of Rule 8.5(b)(2) providing for the application of the professional rules "where the conduct occurred" *or the jurisdiction in which "the predominant effect*" occurred, by a simple conclusion that an attorney has an office here and works from that office. (Emphasis added).

Although the Maryland disciplinary authority—the Commission and ultimately this Court—has jurisdiction to investigate and ultimately to sanction Mr. Tatung for any misconduct pursuant to Maryland Rule 8.5(a), under the choice of law provisions set forth in Rule 8.5(b), the MARPC does not apply to the alleged conduct involving Mr. Tatung's representation of his clients in the federal immigration proceeding. Under Rule 8.5(b)(1), the Commission was required to charge Mr. Tatung under the federal immigration professional rules. Because Mr. Tatung was improperly charged under the MARPC, we shall dismiss those charges arising in connection with the federal immigration proceeding.

### E. *Going Forward—Some Additional Observations about the Choice of Law Provisions*

We make a few additional observations for consideration of the application of the choice of law provisions going forward. First, we are mindful that, in many cases, we have applied the MARPC to attorneys' conduct that occurred in immigration proceedings or in

other jurisdictions where the application of Rule 8.5(b) might have been argued or raised. *See, e.g.*, *Attorney Grievance Comm'n v. Moawad*, 475 Md. 424 (2021); *Attorney Grievance Comm'n v. Riely*, 471 Md. 458 (2020); *Attorney Grievance Comm'n v. Ambe*, 466 Md. 270 (2019). The difference between this case, and other cases, of course, is that no one raised the choice of law issue in the manner that Mr. Tatung has done here. As we explain above, this legal issue is unrelated to jurisdiction—it simply relates to the professional rules to be applied to particular conduct. Accordingly, where the issue is not properly raised, it will be deemed to be waived.

We also point out that, with respect to the application of the federal regulations in immigration proceedings, the regulations specifically contemplate that the rules contained therein may be *supplemented* by a state's professional conduct rules. *See* 8 C.F.R. § 1003.102 (explaining that the enumerated "categories do not constitute the exclusive grounds for which disciplinary sanctions may be imposed by the public interest[]"); *see also Gadda*, 377 F.3d at 945 (noting that "the immigration regulations expressly allow for supplementary regulation[]"). So, for example, if an immigration attorney who is licensed in Maryland commits violations of our professional conduct rules related to trust account violations, in addition to filing charges under the federal disciplinary rules contained in 8 C.F.R. § 1003.102, the attorney may also be charged with violating MARPC 1.15(a) because the federal regulations do not contain any counterpart to that rule.[37]

---

[37] As noted in *Attorney Grievance Comm'n v. Riely*, 471 Md. 458, 493 n.16 (2020), "[i]t has been observed that bar complaints against immigration attorneys have increased as a result of the decision in *In the Matter of Lozada,* 19 I&N Dec. 637 (BIA 1988), 1988 WL 235454, which requires that an immigration client who seeks to reopen an immigration

46

We also observe that this opinion should not be construed as precedent for the notion that we will dismiss attorney misconduct charges in any instance where the Commission files charges under one set of professional conduct rules and a subsequent determination is made by this Court that the choice of law provisions in Rule 8.5(b) mandated the application of the professional rules of another jurisdiction or tribunal. As we explained above, the substance of the professional conduct rules, in most instances, is the same. A competence violation under our MARPC will be, in almost every instance, a competence violation of the rules of another jurisdiction. Given that these professional rules have been enacted for the protection of the public, we do not and will not dismiss charges lightly. As part of our original jurisdiction over these matters, we have the authority to remand a case to the hearing judge for further proceedings where we determine it is appropriate. *See* Rule 19-741(c), Rule 1-201(a) (explaining that where a rule, by the word "shall" mandates certain conduct (such as the application of the choice of law provisions), we may "consider the consequences of noncompliance in light of the totality of the circumstances and the purpose of the rule").

*In this case*, we determine that dismissal of these charges is appropriate because we conclude, based upon our independent review of the record that, had we not dismissed these charges, we would have sustained most of Mr. Tatung's exceptions, and we conclude that the handful of careless mistakes that he made would not have resulted in a sanction of

---

case on the basis of ineffective assistance of counsel must report the attorney to the appropriate disciplinary authority. Melvin Hirshman, *Immigration*, 37 Md. Bar J. (March-April) 59 (2004)."

more than a public reprimand. *See Attorney Grievance Commission v. Butler*, 426 Md. 522, 538–39 (2012) (attorney who failed to appear in court and was disruptive and discourteous but had no record of prior discipline was given a reprimand).[38] Accordingly, we shall dismiss the charges pertaining to the immigration proceeding.

### F. The Application of the MARPC to Charges Arising from Mr. Tatung's Conduct in the Disciplinary Proceeding

Although the federal immigration ethics rules apply to the conduct in connection with the immigration court proceeding, the MARPC applies to charges arising from Mr. Tatung's conduct in connection with the disciplinary proceeding. This is conduct separate and apart from the clients' complaints, and like other jurisdictions, we determine that the

---

[38] In connection with his findings concerning mitigating factors, the hearing judge determined that Mr. Tatung had no prior disciplinary record and a good reputation in the community. Bar counsel filed no exception to these mitigating factors. The hearing judge's findings concerning the presence of aggravating factors contain numerous errors and inconsistencies. Indeed, even Bar Counsel excepted to the following findings as being "unsupported by the evidence in the record" and "irreconcilable with the hearing judge's other findings of fact and conclusions of law[:]" (1) that Mr. Tatung was admitted to the Maryland Bar in 1996; (2) that Mr. Tatung failed to communicate with his client; (3) that Mr. Tatung failed to respond to motions and court orders; and (4) that Mr. Tatung failed to respond to discovery in the disciplinary case. Had we not dismissed the charges, we would have sustained Bar Counsel's and Mr. Tatung's exceptions to these erroneous findings. Notwithstanding these errors, Bar Counsel asserts that the hearing judge correctly found the following aggravating factors (to which Mr. Tatung excepts): a pattern of misconduct; multiple offenses; Mr. Tatung's refusal to acknowledge the wrongful nature of his conduct; and his substantial experience in the practice of law. Bar Counsel also asks us to find additional aggravating factors not found by the hearing judge—specifically, that Mr. Tatung demonstrated bad faith obstruction of the disciplinary proceedings and submitted false statements during the disciplinary process concerning his representation of the clients. Bar Counsel also notes that his clients, as immigrants, were vulnerable victims. Had we not dismissed the charges, we would have sustained Mr. Tatung's exceptions to the aggravating factors relied upon by Bar Counsel for the reasons expressed in this opinion. We conclude that the only aggravating factor that was proven by clear and convincing evidence is that Mr. Tatung's clients were vulnerable victims.

MARPC applies to these charges. We address the merits of the exceptions filed by both Bar Counsel and Mr. Tatung with respect to the factual determinations and legal conclusions made by the hearing judge on these charges.

*Rule 8.1(a) (Bar Admission)*

Rule 8.1(a) states, in pertinent part, that in connection with a disciplinary matter, an attorney shall not "knowingly make a false statement of material fact[.]" The hearing judge concluded that Mr. Tatung violated this rule:

> Because at the outset of Bar Counsel's investigation, he failed to respond to inquiries and request for information from Bar Counsel. Specifically, Mr. Tatung initially failed to acknowledge that he missed the August 23, 2017 Master Calendar Hearing. Further, his continued defense that he did not know that his request had been denied is not supported by the evidence and Mr. Tatung should have known initially that such a request would be denied based upon Judge Abbott's standing orders.

Mr. Tatung excepted to the factual findings underpinning this legal conclusion, as well as the legal conclusion itself. We shall sustain Mr. Tatung's exceptions and do not find by clear and convincing evidence that Mr. Tatung violated Rule 8.1 based upon this record. During the Commission's investigation, Mr. Tatung provided written responses and documents in response to a total of eight separate letters requesting information. Bar Counsel wrote two letters to Mr. Tatung on December 6, 2018, enclosing the complaints and requesting a written response. On December 15, Mr. Tatung sent two written responses—one for each client, three pages in length, explaining his representation. Bar Counsel sent follow-up letters on February 5, 2019, requesting information about certain details of the cases. Mr. Tatung submitted written responses to Bar Counsel on February 8 and 12. Bar Counsel requested additional information by letters dated February 27, 2019

49

(in Ms. Khan's case), and February 26, 2019 (in Ms. Amasioni's case). Mr. Tatung provided written responses on March 9 and 10. Bar Counsel requested additional information in connection with Ms. Amasioni's complaint on May 2, 2019, and Mr. Tatung responded to this request on May 13. Bar Counsel requested additional information in connection with Ms. Khan's complaint on August 12, and Mr. Tatung's response followed on August 22.

It is clear from our independent review of the record that Mr. Tatung filed timely responses to Bar Counsel and attempted to answer the specific questions and requests for information and documents, and that Mr. Tatung tailored his responses to the specific information requested by Bar Counsel in each of his client's cases.

As far as the hearing judge's conclusion that that Mr. Tatung violated Rule 8.1(a) by failing to mention or explain, in his initial December 15, 2018 letters to Bar Counsel, that he missed the August 23, 2017 master calendar hearing, Mr. Tatung provided an explanation to Bar Counsel in his letters dated February 8 and 12, 2019, which is consistent with his testimony on this point before the hearing judge. Mr. Tatung stated under oath at the hearing before the hearing judge, that he simply forgot about the fact that he missed the master calendar hearing. When Bar Counsel brought the missed master calendar hearing to his attention in its February 5, 2019 letters, Mr. Tatung testified that his recollection was refreshed, and he immediately explained the circumstances surrounding his absence in his February 8 and 12 responses. We sustain Mr. Tatung's exception to the hearing judge's finding that he violated Rule 8.1(a). It is not supported by clear and convincing evidence.

Bar Counsel also excepts to the hearing judge's failure to make a factual finding with respect to Mr. Tatung's response to Bar Counsel's February 27, 2019 letter concerning the filing of the attestation affidavit in Ms. Khan's case. In his response dated March 10, Mr. Tatung stated that the attestation affidavit was submitted in Ms. Khan's case due to "an error from [Respondent's] office" and that the error was "specifically addressed in court." Bar Counsel excepts to the hearing judge's failure to make a finding on this issue, and further excepts to the fact that the hearing judge did not make a legal conclusion that this misstatement is a violation of Rule 8.1(a) and 8.4(c). Although we determine that Mr. Tatung was careless and should have been more careful with his responses, we do not find that Bar Counsel proved by clear and convincing evidence that Mr. Tatung's misstatement that the affidavit was "addressed in court" was an intentional misrepresentation on his part which would support a violation of Rule 8.1(a) or 8.4(c).

Because we do not conclude that Bar Counsel established by clear and convincing evidence that Mr. Tatung violated the MARPC in connection with the Commission's investigation or this disciplinary proceeding, we shall dismiss those charges.

## V

## Conclusion

Applying Rule 8.5(b) to the conduct alleged in the Petition for Disciplinary or Remedial Action filed by the Commission, we sustain Mr. Tatung's exception to the application of the MARPC to the proceedings before the federal immigration tribunal, and determine that the Commission should have applied the federal immigration professional rules to misconduct charges arising in connection with the federal immigration court

51

proceeding. For the reasons expressed in this opinion, we shall dismiss the MARPC charges related to the misconduct arising from that proceeding.

With respect to charges filed by the Commission under the MARPC related to allegations of misconduct arising in connection with this disciplinary proceeding, we conclude that the Commission failed to prove any violations of the MARPC. We sustain Mr. Tatung's exceptions to the hearing judge's conclusions related to Rule 8.1(a), and we overrule Bar Counsel's exceptions related to the hearing judge's failure to find additional violations of Rules 8.1(a) and 8.4(c) in connection with the disciplinary proceeding.

**IT IS SO ORDERED; PETITIONER SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT UNDER THE DISMISSAL ORDERED BY THE COURT.**

IN THE COURT OF APPEALS OF
MARYLAND

Misc. Docket AG No. 14

September Term, 2020

---

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

CELESTINE TATUNG

---

Barbera, C.J.,
McDonald,
Getty,
Booth,
Biran,
Wilner, Alan M. (Retired,
    Specially Assigned),
Harrell, Glenn T. Jr. (Retired,
    Specially Assigned),

JJ.

---

Dissent by Harrell, J.

---

Filed: August 26, 2021

Although I agree with much of the Majority opinion's legal analyses, i.e., its research and interpretation of the Maryland Attorneys' Rules of Professional Conduct ("MARPC") 19.308.5(b) and 8.5, I am not persuaded that, on this record, the Majority's application of the choice of law provisions and resultant disposition are the most pragmatic and only reasonable outcome. My preference would be to affirm the hearing judge's conclusions that Mr. Tatung violated Rules 1.5 (Fees), 8.4(d) (Misconduct), and therefore also 8.4(a) (Misconduct). For those violations, I would impose a reprimand as the appropriate sanction. The course of my reasoning is as follows:

(1) The Majority opinion, but for its application of the choice of law principles, would have sustained, as to Mr. Tatung's conduct, violations of Rules. 1.5 (Fees) (slip op. at 21, n.24) and 8.4(d) (Misconduct) (slip op. at 23-24, n.26), and therefore necessarily also Rule 8.4(a) (Misconduct).

(2) Bearing in mind that the federal regulations governing immigration attorneys (8 C.F.R. 1003, et seq.) are intended to supplement, not supplant, the States' professional conduct for attorneys regimes (slip op. at 38), I agree with the Majority opinion's comparison of Maryland's rules of conduct to their federal counterparts (slip op. at 41–45) concluding plainly (slip op. at 42), that, "in most, if not virtually all circumstances, a violation of the MARPC would be consistent with a violation of the federal regulations, and vice versa."

(3) Based on its application of Maryland's choice of law provision, the Majority concludes implicitly that the Commission should have charged Mr. Tatung under the federal regulations that are materially analogous to Maryland Rules 1.5, 8.4(d), and 8.4(a). Thus, I perceive at least two other possible outcomes (rather than a sweeping dismissal):

   (a) The case could be remanded for the Commission to re-charge and re-try Mr. Tatung under the analogous federal regulations to Maryland Rules 1.5, 8.4(d), and 8.4(a). Although that option might yield a better record

than the present one, it is my estimation that such would be, for the most part, an unnecessary expenditure of more time and other resources because the hearing judge and, indeed, the Majority (as am I) are persuaded already that the record as it stands sustains violations of those Maryland Rules and their federal counterparts.

(b)     Mr. Tatung could be issued a reprimand now by this Court because he violated implicitly the federal analogs to Maryland Rules 1.5, 8.4(d), and 8.4(a). This would be my preference.

I think that the latter outcome would be a better future deterrent for Mr. Tatung and his peers in the immigration bar regarding their practice from a Maryland base.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/14a20agcn.pdf